UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

DONALD S. PARKINSON,

                                        Petitioner,

            vs.
                                                        9:01-CV-713
WALTER KELLY, Sup't                                     (S.J. McAvoy)
Attica Correctional Facility,

                                        Respondent.

_____

APPEARANCES                          OF COUNSEL

DONALD S. PARKINSON
Petitioner pro se

ELIOT SPITZER                        NELSON R. SHEINGOLD
Attorney General of the              Asst. Attorney General
State of New York

GUSTAVE J. DI BIANCO, Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the

Honorable Thomas J. McAvoy, Senior United States District Judge, pursuant to 28

U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

Petitioner brings this action for writ of habeas corpus pursuant to 28 U.S.C.

§ 2254, challenging a judgment of conviction rendered on April 3, 1998 in the

Columbia County Court.  Petitioner was convicted by a jury of two counts of

Attempted Aggravated Assault on a Police Officer, Second Degree and Reckless

Endangerment, First Degree and was sentenced to an indeterminate term of 3 to 6

years imprisonment.

The Appellate Division, Third Department affirmed petitioner's conviction on January 20, 2000. *People v. Parkinson*, 268 A.D.2d 792, 702 N.Y.S.2d 216 (3d Dep't 2000).  The New York Court of Appeals denied leave to appeal on May 17, 2000. *People v. Parkinson*, 95 N.Y.2d 801, 711 N.Y.S.2d 169, 733 N.E.2d 241 (2000).  On November 18, 2001, petitioner moved to vacate his conviction in the Columbia County Court pursuant to N.Y. CRIM. PROC. LAW § 440.10.  The County Court denied petitioner's motion on February 12, 2002.

Petitioner raises five grounds in support of his amended petition.[1]

1.     The prosecutor improperly failed to disclose *Rosario* material.

2.     Petitioner received ineffective assistance of trial counsel.

3.     The Grand Jury proceedings were defective.

4.     Petitioner's conviction was against the weight of the evidence.

5.     Petitioner was denied his right to call an expert witness.

Respondent has filed his answer, together with a memorandum of law and the

---

[1] Petitioner was initially ordered to file an amended petition showing that he had exhausted all of his claims in New York State courts.  The amended petition that he filed was almost identical to the original, but changed the order of his claims slightly.  Petitioner's original application was filed with an affidavit in support.  When petitioner filed the amended petition, he did not file the affidavit, however, this court will consider the arguments contained in the original affidavit. (Dkt. No. 2).

pertinent state court records.[2]  For the following reasons, this court agrees with

respondent and will recommend denial of the petition.

## DISCUSSION

### 1.   Facts

Petitioner's conviction in this action was the result of a shooting incident that

occurred on July 20, 1997.  The facts in this case were outlined concisely in the

Appellate Division's decision, affirming petitioner's conviction. *People v. Parkinson*,

268 A.D.2d at 792-93, 702 N.Y.S.2d at 217-18.  The shooting occurred outside of

petitioner's apartment in the Town of Clermont, Columbia County.  Petitioner arrived

home at approximately 10:00 p.m. that night, and one hour later, he loaded a rifle with

several rounds of ammunition, walked outside the door of his apartment, and fired two

rounds into the air. *Id.* 268 A.D.2d at 792, 702 N.Y.S.2d at 217.

Petitioner's landlord, William Bentley, heard the shots, as did various

neighbors. *Id.*  The shots were reported to the State Police, and two State Troopers,

Brian Colwell and John LaPlante, responded to the location. *Id.*  The troopers were

met at the apartment building by Mr. Bentley, who showed the troopers where

petitioner's apartment was located. *Id.*  As the officers approached petitioner's

apartment, they heard petitioner talking in a loud voice to his girlfriend, making

threats to kill her and anyone else who got in petitioner's way. *Id.*

---

[2] The State court records are listed on page 2 of the answer. (Dkt. No. 22).

Petitioner then walked out of the apartment, holding the rifle. *Id.*  The officers identified themselves and asked petitioner repeatedly to put the gun down.  Instead of complying with the troopers' order, petitioner pointed the rifle in the officers' direction.  Officer LaPlante fired a shot at petitioner, and petitioner fired back at Officer LaPlante.  The officers then fired repeatedly at petitioner, causing him to fall to the ground and let go of the rifle. *Id.* 268 A.D.2d at 792, 702 N.Y.S.2d at 217-18.

After petitioner fell to the ground, the officers ordered petitioner to show his hands.  Instead of complying with the officers' request, petitioner sat up and attempted to reach for the rifle. *Id.* 268 A.D.2d at 792, 702 N.Y.S.2d at 218.  Officer Colwell fired another shot, and petitioner then complied with the officers' directions. *Id.* Petitioner was handcuffed and arrested.  Petitioner suffered three gunshot wounds as a result of the incident.  The officers were not injured. *Id.*

Petitioner was indicted on two counts of attempted aggravated assault on a police officer and one count of first degree reckless endangerment.  Petitioner maintained throughout his lengthy trial that he did not fire the first shot, nor did he threaten the officers in any way. *Id.* 268 A.D.2d at 792-93, 702 N.Y.S.2d at 218.

Both officers testified at petitioner's trial.  Officer Colwell stated that on July 20, 1997, he was working the 11:00 p.m. to 7 a.m. shift with Officer LaPlante. Trial Transcript (T) at 130.  Shortly after 11:00 p.m. that night, a 911 call came into the station, stating that shots had been fired. (T. 131).  Officers Colwell and LaPlante

4

were dispatched to the scene. (T. 133).  When they arrived at the petitioner's apartment complex, the landlord, Mr. Bentley met the officers in the front of the building and directed them to the back of the building. (T. 137).

As the officers approached the area they heard a male voice yelling and making threats and other violent statements. (T. 175).  Ultimately, the petitioner came out of the door of his apartment, holding a gun. (T. 181-82).  Officer Colwell testified that Officer LaPlante yelled: "Police, drop the gun." (T. 182).  However, petitioner did not drop the gun, and instead, turned toward the officers and pointed the gun at them. (T. 183).  Officer Colwell stated that when petitioner turned the gun on the officers, Officer LaPlante fired his gun at the petitioner. (T. 183).  Petitioner then fired one shot at the officers. (T. 183).  At that point, both officers fired back at petitioner. (T. 183). Officer Colwell testified that he knew the petitioner had fired his gun because Officer Colwell could see the muzzle flash from petitioner's gun. (T. 183).

Petitioner then fell to the ground, and Officer Colwell shouted for the petitioner to show the officers his hands.  Instead, petitioner grabbed for the gun that had fallen at his feet. (T. 183).  Officer Colwell testified that he continued to tell petitioner to show them his hands, but petitioner did not cooperate.  Officer Colwell then yelled to Officer LaPlante that petitioner was reaching for the gun again, and Colwell fired one more shot at petitioner. (T. 184).  This time, petitioner complied with the officer's order. (T. 184).  Colwell testified that he shot 18 rounds of ammunition, and had

continued firing until he believed that petitioner was no longer a danger to the officers. (T. 184).

Notwithstanding that petitioner had fallen to the ground, Officer Colwell testified that petitioner continued to scream obscenities and threats at the officers. (T. 188). After the officers approached the petitioner and handcuffed him, petitioner swung his arms at Officer LaPlante and hit him in the face. (T. 189). Officer Colwell also testified that petitioner attempted to hit Officer LaPlante with a chair and continued to swear even after the emergency medical technicians (EMTs) arrived in the ambulance to take petitioner to the hospital. (T. 190). Officer Colwell testified that as the EMTs were taking petitioner away, petitioner yelled to his girlfriend that they had to "get their stories straight." (T. 191).

Officer Colwell also testified that a friend of petitioner's arrived at the scene and also became belligerent to the point where he picked up a crutch and started swinging it at the officers. (T. 191). The officers had to arrest the individual. (T. 191).

Officer LaPlante's testimony was consistent with the testimony of Officer Colwell. Officer LaPlante testified that after they arrived at the scene, they heard petitioner making threats. (T. 386). Officer LaPlante stated that he told petitioner to drop the gun, but that instead of complying with that order, petitioner turned the gun toward the officers. (T. 399). Officer LaPlante admitted shooting first, but also stated that after he shot at petitioner, petitioner shot back at the officers, causing both

6

officers to shoot at petitioner until they felt that their lives were no longer in danger. (T. 403). Officer LaPlante also testified to seeing the muzzle flash as petitioner shot his rifle at the officers. (T. 399). Officer LaPlante also testified that petitioner attempted to punch LaPlante after petitioner had been handcuffed and attempted to throw a metal chair at the officers after the officers offered petitioner the chair so he could sit down. (T. 406).

Petitioner's next door neighbor, Lori Region[3] also testified for the prosecution. Ms. Region testified that she was awakened shortly after 11:00 p.m. on the night of July 20, 1997 by a loud noise. (T. 485-86). She then heard another loud noise which sounded like a gun shot near her window. (T. 486). She testified that she heard petitioner walking outside. (T. 487). She knew it was petitioner because he had a distinctive walk due to a prosthetic leg. (T. 487). Ms. Region stated that she could hear petitioner walking back into his apartment yelling. (T. 487).

Ms. Region called a friend who was a dispatcher for the Sheriff's Department, who told her to call the New York State Police to report the shots being fired. (T. 488). Ms. Region stated that she hesitated calling the police herself because she knew petitioner. Instead, she called her sister, who called the State Police to report that shots had been fired. (T. 488-89). Ms. Region stated that she heard the police arrive and that she heard a voice yell: "Police." (T. 491). She then heard the words repeated:

---

[3] Ms. Region is also referred to as Lori Magyar since her name had changed prior to the trial.

"Police, drop the gun." (T. 491). Ms. Region then heard shots fired, although the noise was not as loud as the shots she had heard before she called the police. (T. 491). Ms. Region testified that the shots sounded as if they were coming toward her door. (T. 491).

After hearing the shots, Ms. Region heard a loud bang that sounded as if it were coming from the direction of petitioner's apartment. (T. 492). Ms. Region stated that the loud bang sounded like the petitioner's gun. (T. 492). After that shot, Ms. Region heard more gun fire. (T. 493). Later, Ms. Region heard someone tell petitioner to keep his hands down, and she heard petitioner yelling that he was "riddled" and yelling to his girlfriend to "remember the story." (T. 493). Ms. Region heard petitioner say that he had the gun over his head, and he was going to throw it in the pond. (T. 493). Ms. Region also heard petitioner yell obscenities at the officers. (T. 493).

Ms. Region stated that she heard a voice tell petitioner to "stay still." (T. 493). Ms. Region stated that petitioner was shouting at the EMTs and telling them that petitioner would "rip their fucking hearts out." (T. 494). Ms. Region also stated that she saw a friend of petitioner's rip his shirt off and attack the officers with a crutch. (T. 495). Ms. Region stated that the officers were attempting to calm the individual down. (T. 496).

Corrections Lieutenant David J. Michael testified that he knew the petitioner through petitioner's ex-wife. (T. 570). Lieutenant Michael was dating petitioner's ex-

wife during the time of this incident. (T. 570).  Lieutenant Michael testified that on July 19, 1997, he was asleep in petitioner's ex-wife's home, when petitioner came bursting through the door holding a gun and yelling. (T. 571).  Although petitioner did not threaten or hurt anyone that night, he left shortly thereafter with the gun in his hand. (T. 571-72).  Lieutenant Michael testified that it looked like the gun that was in a gun cabinet in petitioner's wife's home. (T. 573).

The prosecutor also called petitioner's girlfriend, Renee Goddard, to testify. She was living with petitioner at the time of the incident. (T. 259).  Ms. Goddard testified that on the night of the shooting petitioner came home in a good mood, but that his mood changed during the evening, and he became boisterous, agitated, and obnoxious, "pushing things around." (T. 261).  At one point, petitioner picked up a rifle, began loading it and unloading it, and placed it under his chin. (T. 262).  Ms. Goddard testified that petitioner "was depressed." (T. 262).  She stated that petitioner was angry at the landlord, Mr. Bentley, and that she attributed his actions to "drunk talk" because petitioner had a few beers before he came home. (T. 261, 263).

Ms. Goddard also stated that petitioner went outside and shot his rifle twice into the air. (T. 264).  She gave a statement to the police the day after the incident, wherein she stated that after petitioner shot the two rounds into the air, he came back in and stated that he had four rounds left in the rifle and "that one was for him, and the rest was for whoever else got in his way." (T. 269-70).  The prosecutor also pointed out

that during Ms. Goddard's Grand Jury testimony she testified that petitioner stated that he "had four rounds left in the rifle and [sic] three for the cops and one for him, that he wasn't going out alone." (T. 275). Ms. Goddard stated that petitioner went outside when he heard a twig snap, and that after the left the apartment, Ms. Goddard heard someone say "show your hands," but she was not exactly sure of the exact words. (T. 276). She stated that the next thing she heard was gunfire. (T. 276). Ms. Goddard stated that after petitioner was hit, he told the police that he was "just trying to unload [the rifle]." (T. 277). Ms. Goddard testified that after the shooting, she called petitioner's friend, Michael Shea. (T. 277).

Ms. Goddard stated on cross-examination that when petitioner went outside his gun was "pointed up" and that he had "crutches" under his left shoulder. (T. 281). She also testified on cross-examination that as petitioner walked out the door, she heard the voice and the shooting began "almost immediately." (T. 282). She stated that she did not hear just one shot initially. It was a "barrage of shooting." (T. 283). She testified that when she gave the police her statement, she did not "feel right." (T. 290).

Sergeant Leonard White, a Zone Sergeant for the State Police also testified. He monitored a radio transmission indicating that shots had been fired at the Elizaville location. (T. 317). He arrived at the location after Troopers LaPlante and Colwell. (T. 319). Sergeant White spoke with the landlord Mr. Bentley and then told Troopers LaPlante and Colwell that he was going to try to telephone petitioner's apartment. (T.

10

320-21).  Sergeant White was, however, unable to obtain the telephone number. (T.

322).  White went to Mr. Bentley's apartment, but Mr. Bentley could not find the

telephone number. (T. 323).  However, Mr. Bentley told Sergeant White that the wall

of Bentley's apartment was shared with the petitioner's apartment, and Sergeant White

was able to listen to the conversation occurring in the petitioner's apartment. (T. 324).

Sergeant White testified that he heard a male and a female voice in the

apartment, and ultimately heard the male voice state that he was going to die that

night, but that he was "not going to die alone." (T. 325).  He then left Mr. Bentley's

apartment, and as he was walking around the apartment complex, he heard one or both

Troopers identify themselves as police officers, and then Sergeant White heard an

exchange of gunfire. (T. 327).  Sergeant White stated that he assisted Troopers

Colwell and LaPlante by placing handcuffs on petitioner, who shouted obscenities at

White. (T. 330).

Sergeant White also stated that after the shooting, petitioner's friend Michael

Shea arrived at the scene. (T. 232).  Sergeant White stated that Mr. Shea picked up a

crutch, and White believed that Shea was going to hit someone with the crutch, so

White grabbed Shea and handcuffed him. (T. 333).  The emergency medical

technicians (EMT) who later arrived on the scene also testified that petitioner was

very belligerent, and initially threatened to kill himself, the officers, and the EMTs. (T.

368).  One of the EMTs also testified that as they were taking petitioner to the

hospital, he yelled to the woman in his apartment that they "had to get [their] stories straight", that petitioner had walked out of the apartment and the "bastards" shot him. (T. 369).

The prosecution called police investigators as well as firearms experts to testify about the evidence recovered at the scene of the incident as well as about the guns and the bullets used by the officers and by petitioner.  Senior Investigator Thomas Martin testified that thirty five of the thirty six rounds of ammunition fired by the police officers were recovered. (T. 622).  A .30-.30 rifle casing was also found on the scene. (T. 631).  The investigator testified that the bullet from the rifle was not recovered, but that it was not unusual to not find the projectile from a rifle. (T. 648).

Kevin Rosa, a New York State Police Investigator testified that when petitioner's rifle was recovered, it was in a "firing position." (T. 912).  He explained that after a rifle was fired, the shell would be ejected, and the lever would have to be pulled to place the next round of ammunition in the chamber. (T. 911).  Craig Grazier, a New York State Police Officer, working in the Forensic Identification Center in Albany, New York explained to the jury how a .30-.30 rifle was fired. (T. 932).  He also testified that the next cartridge that was in the chamber of petitioner's rifle had a "light hit" on it, meaning that the firing pin could have struck the primer lightly, but not sufficiently enough to cause the primer to discharge and the gun to fire. (T. 937).

2.     **Standard of Review**

The standard of review in a habeas action depends upon whether the state court considered petitioner's constitutional claims "on the merits." The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides that a federal court lacks the power to grant a writ of habeas corpus under 28 U.S.C. § 2254 unless the state court ruling ***on the merits*** of a federal constitutional issue was either "'contrary to ... clearly established Federal law' or 'involved an unreasonable application ... of clearly established Federal law.'" *Noble v. Kelly*, 246 F.3d 93, 98 (2d Cir.)(quoting 28 U.S.C. § 2254(d)(1))(alterations in original), *cert. denied*, 534 U.S. 886 (2001). The statute further provides that the court may grant a writ of habeas corpus when a claim that was considered on the merits by the state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Prior to the AEDPA, the court was not required to defer to state court determinations on pure questions of law and mixed questions of law and fact. *Thompson v. Keohane*, 516 U.S. 99, 107-13 (1995). When presented with these questions, the court was empowered to conduct an independent review of the record. *Id.* The factual findings of the state court, however, were presumed to be correct absent circumstances listed in the statute, such as cases in which the factual finding was not fairly supported by the record. 28 U.S.C. § 2254(d) & (d)(8). The AEDPA

requires the court to apply a more deferential standard, placing new restrictions on the power of federal courts to grant writs of habeas corpus to state inmates. *Williams v. Taylor*, 529 U.S. 362, 399 (2000).

In order to apply the AEDPA standard, the petitioner's claim must have been "adjudicated on the merits" in the State court proceedings. 28 U.S.C. § 2254(d)(1). Additionally, the AEDPA provides that a state court's fact findings are presumed correct, unless that presumption is rebutted by clear and convincing evidence. *Id.* § 2254(e)(1). If the State court has failed to adjudicate a claim "on the merits", the pre-AEDPA standard of review applies, and the court reviews both questions of law and mixed questions of law and fact *de novo. Washington v. Shriver*, 255 F.3d 45, 55 (2d Cir. 2001).

A state court's decision is contrary to federal law if it arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. at 413. A state court unreasonably applies clearly established federal law when the correct principle is identified, but the state court unreasonably applies that principle to the facts of the petitioner's case. *Id.*

## 3.   *Rosario* **Material**

Petitioner claims that the prosecutor failed to provide defense counsel with

statements of Officers Colwell and LaPlante that were allegedly taken during an internal investigation of the officer's conduct.  Petitioner alleges that this material would have constituted *Rosario* material, and the failure to turn the material over to the defense counsel constitutes reversible error pursuant to *People v. Rosario*, 9 N.Y.2d 286, 173 N.E.2d 881, 213 N.Y.S.2d 448 (1961), *cert. denied sub nom. Rosario v. New York*, 368 U.S. 866 (1961).

Pursuant to *People v. Rosario*, the prosecutor must provide a criminal defendant with the pre-trial statements of any witness who will be called to testify for the prosecution.  A *Rosario* claim is based purely on New York State law.  Errors of state law are **not** grounds for habeas relief.  *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991). It has been specifically held that *Rosario* violations do not rise to the level of federal claims that are cognizable in a habeas corpus application. *See Morrison v. McClellan*, 903 F. Supp. 428, 429 (E.D.N.Y 1995).

Thus, to the extent that petitioner alleges a *Rosario* violation alone, this claim is not cognizable in this federal petition and may be dismissed.  However, in petitioner's state court appellate brief, in conjunction with his *Rosario* claim, he also raised a claim under *Brady v. Maryland*, 373 U.S. 83 (1963).  Petitioner claimed, not only that the prosecutor failed to produce the officers' statements, but that those statements would have been **exculpatory**.  The Appellate Division specifically considered and rejected the *Brady* issue on the merits.  Petitioner also raised this issue in his section

440.10 motion, and the County Court judge stated that the Appellate Division had already considered the issue and thus it was necessary to dismiss the claim statutorily. State Court Record[4] at p.411. However, the County Court judge then stated that "some further discussion was necessary and reiterated the Appellate Division's finding on the merits that the existence of the materials was "speculative." State Court Record at p.411-12. Thus, the State Courts' decision on this issue was clearly on the merits, and the AEDPA standard applies to this court's review of the *Brady* claim. Given the liberality with which the court must treat pro se petitions, this court will also address petitioner's claim to the extent that it could be considered a *Brady* claim.

Under *Brady v. Maryland, supra*, a prosecutor has the duty to produce evidence favorable to the defense. To prevail on a *Brady* claim, petitioner must show that the prosecution suppressed evidence favorable to him and that the evidence was material either to guilt or punishment. *Brady*, 373 U.S. at 87. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Payne*, 63 F.3d 1200, 1209 (2d Cir. 1995)(quoting *United States v. Bagley*, 473 U.S. 667, 682

---

[4]Respondent has submitted various state court records, including the petitioner's documents on appeal as well as the trial transcript. The first group of state court records are bound and include petitioner's brief to the Appellate Division; his Appendix to the Appellate Division; his reply brief to the Appellate Division; his application for leave to appeal to the New York Court of Appeals; the certificate denying leave to appeal; his section 440.10 motion and County Court Judge Lehman's decision denying that motion. The pages of this bound volume are "Bates-Stamped" at the lower right hand corner. I will refer to this bound volume as State Court Record and cite the Bates-Stamped page number.

(1985)), *cert. denied*, 516 U.S. 1165 (1996).  A reasonable probability is a probability sufficient to undermine confidence in the outcome of the case.  *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987).

In considering petitioner's *Rosario/Brady* claim, the Appellate Division found as a fact that "the record wholly fails to establish that any such statements and/or testimony actually exist." *People v. Parkinson*, 268 A.D.2d at 793, 702 N.Y.S.2d at 218.  The Appellate Division also stated that "speculation concerning the existence of such accounts or statements is insufficient to establish a *Rosario* or *Brady* violation. *Id.* As stated above, the Appellate Division's fact finding is statutorily "presumed correct" unless petitioner can show otherwise by "clear and convincing" evidence. 28 U.S.C. § 2254(e)(1).

In this case, petitioner has not come forward with ***any evidence*** that would rebut the presumption attributed to the Appellate Division's finding that the record failed to establish the existence of any statements by the officers.  Petitioner ***assumes*** that there were statements ***and*** that those statements were exculpatory.  Even if statements existed, the failure to turn over the statements would have been only a state law violation,[5] unless those statements were also exculpatory under *Brady*.  Petitioner himself states that the administrative hearings "cleared" the officers of any

_____

[5] As stated above, the state law claim is not cognizable in this habeas corpus petition, unless it also constitutes a federal constitutional violation. *Estelle v. McGuire*, 502 U.S. at 67.

misconduct.  Thus, even if statements existed, chances are slight or more likely none, that those statements would have been ***exculpatory*** to petitioner.

Since petitioner has not come forward with any "clear and convincing" evidence that the Appellate Division's ***fact finding*** was incorrect, the court must presume that no statements existed, and therefore, the Appellate Division's ***legal determination*** that no *Brady* violation occurred is not contrary to clearly established Federal law, nor did it involve an unreasonable application of clearly established Federal law.[6]  Thus, petitioner's *Rosario/Brady* claim may be dismissed.[7]

## 4.   Ineffective Assistance of Counsel

Petitioner claims that his trial attorney was ineffective because he did not request a "bill of particulars" and failed to object to the introduction of prejudicial evidence.  Petitioner also claims that his attorney did not ask for discovery and did not obtain the petitioner's crutch that had three bullet holes in it.  Petitioner states that his attorney knew that he was innocent and "tried his best to represent [him] at trial", but was ineffective.

Petitioner raised a claim of ineffective counsel on direct appeal as well as in his

---

[6] Because the Appellate Division found that no statements existed, and that finding is presumed correct, this court need not proceed to the second part of the *Brady* analysis which asks whether the evidence was "material" to guilt or punishment.

[7] The court does note that in the decision on petitioner's section 440.10 motion County Court Judge Lehman implied that he would consider a subsequent section 440.10 motion if petitioner could develop some evidence to show that any statements existed. State Court Record at p.412-13.

section 440.10 motion to vacate his conviction.  The Appellate Division clearly denied petitioner's claim on the merits. 268 A.D.2d at 794-95, 702 N.Y.S.2d at 219.  The County Court Judge appears to have denied the claim because the Appellate Division had already decided the merits of this issue. State Court Record at 411.  Thus, the State Courts have decided the merits of this issue, and the AEDPA standard applies to the determination of this claim.

The well-established Supreme Court precedent, provides that a claim of ineffective assistance of counsel is sustainable only if counsel's representation fell below an objective standard of reasonableness, and there is a reasonable probability that, absent counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992), *cert. denied*, 508 U.S. 912 (1993).  In applying this test, a reviewing court must be "highly deferential" and presume that counsel's conduct falls within the range of reasonable performance.  *Strickland*, 466 U.S. at 689.  Any counsel errors must be considered in the aggregate, rather than in isolation. *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001).  However, failure to make meritless arguments or objections cannot constitute ineffective assistance. *United States v. Arena*, 180 F.3d 380, 396 (2d Cir. 1999).

In his habeas application, petitioner claims that his attorney failed to request a bill of particulars and failed to object to the admission of the video tape of petitioner's

rifle firing.  In his appellate brief, petitioner's counsel engaged in a lengthy argument regarding the alleged ineffectiveness of trial counsel. State Court Record at 21-33 43-51.

Petitioner's appellate counsel also argued that trial counsel improperly elicited prior bad acts by petitioner; failed to obtain a crutch that petitioner was using the night of the incident; failed to obtain the officers notes regarding the failure to mention the fact that petitioner fired a shot from his rifle; failed to obtain the *Rosario* material or make a *Rosario* objection; did not properly argue that a defense expert should be allowed to testify; elicited testimony from a State Police witness that petitioner's gun was cocked when it was taken into police custody; elicited an opinion from the same witness that petitioner did shoot one round; elicited testimony from a defense witness that the witness heard the police tell petitioner to drop the gun; elicited testimony from a defense witness that petitioner was agitated prior to the shooting; and failed to object to the introduction of testimony regarding petitioner's prior bad acts.

In rejecting petitioner's ineffective counsel claim on the merits, the Appellate Division stated that

> defendant was advised by County Court that his retained attorney had been removed from a previous criminal case upon such basis and despite such knowledge, defendant unequivocally indicated that he wished his counsel to remain.  Upon our view, we find that ***despite a paucity of evidentiary objections***, counsel provided [petitioner] with meaningful representation.

268 A.D.2d at 794-95, 702 N.Y.S.2d at 219 (emphasis added).

This court has counted approximately twelve errors that petitioner in this petition, and his appellate counsel in his appellate brief, claim were committed by defense counsel.  Some of the errors were also considered as separate claims by the Appellate Division and found to be without merit.

The claim that counsel failed to request a bill of particulars was related to the claim that the indictment was defective for failure to notify petitioner of the crimes charged.  Appellate counsel argued that the indictment was defective for lack of notice, and that counsel was ineffective in failing to request a bill of particulars to rectify that defect in the indictment.  However, the Appellate Division found that the indictment was not defective for lack of notice.  According to the cased cited by both defense counsel and by the Appellate Division, the indictment need only allege where, when, and what the defendant did. *See People v. Iannone*, 45 N.Y.2d 589, 598, 412 N.Y.S.2d 110, 116, 384 N.E.2d 656, 663 (1978).

In this case, the portions of the indictment in question stated that petitioner was being charged with two counts (one for each officer) of Aggravated Assault upon a Police Officer or a Peace Officer in violation of N.Y. PENAL LAW §§ 110.00 and 120.11.[8]  Section 120.11 of the New York Penal Law provides that a person is guilty

---

[8] A copy of the indictment in petitioner's case was submitted under separate cover by respondent's counsel on March 1, 2003.

of aggravated assault on a police or peace officer when, with intent to cause physical injury to a person whom he knows or reasonably should know is an officer engaged in the course of performing his or her official duties, he causes such injury by means of a deadly weapon or dangerous instrument.  Section 110.00 of the New York Penal Law provides that a person is guilty of attempt to commit a crime when, with the intent to commit the crime, he or she engages in conduct which tends to effect the commission of the crime.

The indictment in this case basically states that on July 20, 1997, the petitioner attempted to cause serious physical injury to a person whom he knew or should have known was a police or peace officer in the course of his duties.  The indictment further provides that petitioner attempted to cause this injury by means a loaded firearm. The first count of the indictment related to Officer Colwell, and the second count of the indictment related to Officer LaPlante.  Petitioner's appellate counsel argued that the indictment should have specified how petitioner attempted to cause that injury and should have specified whether petitioner actually shot at the officers; pointed the firearm at the officers, threatening to shoot them; or pointed and cocked the loaded firearm.

The indictment tracked the language of the statute and contained all the elements of the crime charged.  Thus, the indictment was not defective, and counsel could not have acted unreasonably in failing to request a bill of particulars for further

specification.  Appellate counsel also argued that trial counsel was ineffective in

failing to obtain the *Rosario* material or make a *Rosario* objection.  As stated above,

there was no evidence that any such material existed, and if it did exist, since

petitioner himself alleges that the administrative proceeding "cleared" the officers, it

is unlikely that the material would have benefitted petitioner in any way.  Thus,

counsel did not act unreasonably in failing to obtain material that no one has shown

existed.

Petitioner's appellate counsel also argued that trial counsel improperly elicited

prior bad acts by petitioner and failed to object to the prosecutor introducing

testimony regarding prior bad acts.  One of the prosecution's main witnesses was Lori

Region, petitioner's neighbor.  Her testimony was damaging to petitioner because it

was consistent with the officers' version of the shooting incident.  She testified that

she heard the original gun shots which caused her to contact the police. (T. 486-87).

She then testified that when the police arrived, she heard them say "Police" and

"Police, drop the gun" prior to any shooting. (T. 491).  She stated that she then heard

shots, but not as loud as the original shots, and they sounded like they were coming

right for her door. (T. 491).  Then she stated that she heard a louder shot, coming from

the angle of petitioner's apartment. (T. 492).  After that shot, she heard more gun fire.

(T. 492).

This testimony was consistent with the officers' testimony that they told

petitioner to drop the gun, but he refused.  This testimony was also consistent with the officers' testimony that Officer LaPlante fired the first shot, but that petitioner also fired his rifle once prior to the officers returning fire.  Ms. Region also heard petitioner yelling obscenities at the police and telling his girlfriend to remember the "story." (T. 493-94).  This witness was particularly damaging to petitioner because she appeared to be a completely unbiased witness, and her story was entirely consistent with the prosecution's theory of the case.

On cross-examination, defense counsel was attempting to show that Ms. Region may not have been as unbiased as it appeared on direct examination.  Ms. Region and petitioner worked together, and petitioner had moved into his apartment because Ms. Region had advertised the apartment's availability at work. (T. 518).  Defense counsel asked Ms. Region if she had been "emotionally involved" or had a sexual relationship with petitioner in the past. (T. 519).  Ms. Region stated that she had not had a sexual relationship with petitioner, and they were just friends. (T. 519-20).  Defense counsel then asked Ms. Region if she had been jealous when petitioner's girlfriend Renee moved in with him, but Ms. Region denied being jealous because she was dating someone else at the time. (T. 520).

Defense counsel's theory was that Ms. Region was jealous, and that the jealousy was "coloring her response to the events and subsequent to the events." (T. 519-20). He explained this theory to the court when the prosecutor objected to the question

24

regarding the sexual relations. (T. 519).  The court allowed counsel to continue with

his line of questioning to determine whether the witness "had a motive to fabricate."

(T. 519).

Since Ms. Region denied the relationship, when petitioner took the stand, his

attorney asked petitioner whether he had sexual relations with Ms. Region. (T. 1669).

Petitioner responded that he and Ms. Region had sexual relations several times at their

workplace. (T. 1670).  He then described the locations where this allegedly occurred.

(T. 1670-74).  Appellate counsel argued that by admitting that petitioner had sexual

relations at work with Ms. Region, he irreparably damaged petitioner in the eyes of the

jurors, and that this made counsel ineffective.

However, counsel's strategy was to impeach Ms. Region by implying that she

was testifying for the prosecution because she had a previous relationship with

petitioner and was jealous of his new girlfriend.  Since Ms. Region's testimony was

particularly damaging to petitioner, it was not unreasonable conduct for counsel to

attempt to impeach the witness.  The motivation of a witness in testifying including

her possible bias or prejudice against the defendant is one of the principal subjects for

cross-examination. *Henry v. Speckard*, 22 F.3d 1209, 1214 (2d Cir. 1994)(citing

*David v. Alaska*, 415 U.S. 308, 316-17 (1974))(cited in the context of a confrontation

clause claim).

Since Ms. Region's testimony was particularly damaging, and if it were true

that she was jealous of petitioner's new relationship, counsel may have determined that it was important to attempt to impeach Ms. Region, even if the fact that she and petitioner had sexual relations at work would not paint petitioner in a favorable light. Counsel's strategy, although it may have been unsuccessful, was not unreasonable, given the facts in this case.   If, in fact, Ms. Region had been testifying for the prosecution because she was biased against petitioner due to a failed relationship or due to jealousy, and counsel had not raised the issue, petitioner might now be claiming that counsel was ineffective because he did **not** raise possible impeachment information.

Appellate counsel also claimed that petitioner's trial counsel failed to object to the admission of a video-tape of a rifle firing and a still photograph taken from the video-tape.  As stated above, if there is no evidentiary error, counsel cannot have acted unreasonably in failing to object.  The prosecution introduced evidence of a video-tape of the petitioner's rifle firing so that the jury would understand what the muzzle flash looked like that the officers testified that they saw when petitioner fired his rifle in their direction. (T. 937-40).  The video-tape was made by the testifying witness (T. 938), the gun was petitioner's rifle (T. 939), and the gun was fired by the witness himself. (T. 940).

Under New York law, videotape evidence is admissible once a proper foundation has been laid if the tape is a true, authentic, and accurate representation of

the event taped without distortions or deletions. *See People v. Curcio*, 169 Misc. 2d 276, 279, 645 N.Y.S.2d 750, 752 (Sup. Ct. St. Lawrence Cty. 1996). Demonstrative evidence is admissible in the judge's discretion, and variations between the demonstration and the original event may affect the **weight** of the evidence, but do not require exclusion. *People v. Diaz*, 163 Misc. 2d 390, 396, 625 N.Y.S.2d 388, 392 (Sup. Ct. Bronx Cty. 1994).

In this case, both officers testified that they saw a muzzle flash from petitioner's rifle. (T. 183, 399). The videotape was introduced to simulate what a muzzle flash from the petitioner's rifle would look like in the lighting conditions that existed at the time of the shooting incident. The simulation was relevant to the issue of what the officers observed when they were confronting petitioner on the night in question. The videotape was made with petitioner's own gun, and the officer who made the videotape testified to its contents and authenticity. The photograph was taken from the videotape. (T. 941). An objection by defense counsel to the admission of the videotape would have been futile since the tape was admissible under New York law. Thus, counsel did not act unreasonably in failing to object, regardless of whether the videotape was "prejudicial" to petitioner.

Appellate counsel also claimed that trial counsel failed to obtain the crutch that petitioner had been using on the night of the shooting and failed to obtain the officers' notes regarding the incident. As respondent points out, petitioner's counsel did move

to recall the defendant after his testimony had been completed because the crutch was "found". (T. 1992).  Petitioner's counsel argued that the crutch contained petitioner's fingerprints on it, a bullet hole in it, and scratches on it. (T. 1992).  Defense counsel argued that it was "newly discovered" evidence. (T. 1993).

The prosecutor objected, and the court denied counsel's motion to put the petitioner back on the stand because the crutch was "found" in the petitioner's ex-wife's house with all the rest of his belongings. (T. 1993-94).  The court determined that the crutch had been in petitioner's possession all along. (T. 1994).  The prosecutor also pointed out that a different crutch belonging to petitioner had been taken into police custody in conjunction with the arrest of petitioner's friend Michael Shea, who attacked the police with the crutch as they were arresting petitioner. (T. 1995).  Since the second crutch was in petitioner's ex-wife's possession, defense counsel's actions in not obtaining the crutch could not have been unreasonable.

Petitioner claims that his attorney was ineffective in failing to obtain the officers' notes regarding the incident. (State Court Record at 22-23, Petitioner's Appellate Brief at 21-22).  The purpose of these notes was to show that the officers never mentioned that petitioner shot his gun during the incident.  Appellate counsel admits, however, that the officers were cross-examined on this issue even though the notes were not introduced as evidence. (*Id.* at 23, Brief at 21).  However, the Appellate Divsion noted that defense counsel also introduced a teletype that came from the State

Police.  The teletype never mentioned that petitioner fired the rifle.  The teletype

stated only that petitioner was told to drop his gun and instead "trained the rifle upon

the [officers]."  The teletype further states that the officers "discharged their issued

weapons ... causing the [petitioner's] injuries." 268 A.D.2d at 793, 702 N.Y.S.2d at

218.

     A review of the trial transcript shows that the officers were recalled to the stand

by defense counsel and ***specifically questioned about their notes***. (T. 1624 -Officer

LaPlante, 1638- Officer Colwell).  Trial counsel referred to the notes and pointed out

that there was no indication in either Officer LaPlante's notes or in Officer Colwell's

notes that petitioner fired his gun at the officers at any time. *Id.*  Both officers

admitted not putting that fact in their notes.  Thus, the jury had the information to

consider even if the notes themselves were not introduced, and trial counsel did not

act unreasonably when he failed attempt introduce the notes as evidence.[9]

     Petitioner's appellate counsel also claimed that trial counsel failed to object to

the introduction of petitioner's prior bad acts.  This statement, however, is not

completely correct.  Petitioner was afforded a pretrial hearing pursuant to *People v.*

*Ventimiglia*,  52 N.Y.2d 350, 420 N.E.2d 59, 438 N.Y.S.2d 261 (1981).  During a

*Ventimiglia* hearing, the court assesses the probative force and prejudicial effect of

---

[9] This court makes not finding as to whether those notes would have been admissible in any
event.

29

any uncharged crimes and prior bad acts sought to be introduced at trial. *Id.*  In

petitioner's case, after the *Ventimiglia* hearing, the **court ruled** that certain of

petitioner's prior bad acts would be admissible.

Petitioner's appellate counsel argued that when the prosecutor introduced the

prior bad acts that were allowed by the court, she went "beyond" what was allowed,

and counsel did not object.  A review of the claims contained in petitioner's appellate

brief shows that trial counsel did not act unreasonably in failing to object to the

alleged "additional evidence."  Appellate counsel argued that the *Ventimiglia* notice

stated that petitioner entered his ex-wife's residence at 3:15 a.m., took a rifle, and

stated with the gun in his hand, that he was not going to take it any more and was

going to kill someone. (State Court Record at 54, Petitioner's Appellate Brief at 52).

The court allowed this evidence.  Appellate counsel then argued that at trial, the

prosecutor admitted "additional" evidence when the witness testified that petitioner

"burst into" his ex-wife's bedroom at 3:15 a.m. and yelled "wake the fuck up." *Id.*

Appellate counsel argued that this information "went beyond" the notice provided for

by the prosecutor.

This court does not agree that trial counsel's failure to object to this

"additional" evidence was unreasonable conduct.  Clearly entering an ex-spouse's

home at 3:15 a.m. would generally involve waking the individual.  This testimony by

the ex-spouse's boyfriend was not "additional evidence", it was merely a description

of the event, and an objection by trial counsel would have been futile since the evidence had already been the subject of a pretrial hearing.

Appellate counsel also argued that the prosecutor introduced evidence that petitioner had gotten a scraped elbow in a fight with a friend.  Appellate counsel argued that this evidence was not contained in the *Ventimiglia* notice, and that trial counsel should have objected.  This minor information that had no relationship to the incident in question would not have prejudiced the petitioner, thus, counsel's failure to object was not unreasonable.

Without covering every claim of failure to object to bad act evidence, this court would simply note that trial counsel did not act unreasonably in his failure to object to evidence that the trial court had already ruled admissible in a pretrial hearing.

Appellate counsel also argued that defense counsel was ineffective because he elicited incriminating evidence from his own witnesses.  Appellate counsel claimed that trial counsel improperly elicited testimony from a State Police witness that petitioner's gun was cocked when it was taken into police custody and elicited testimony from the same witness that petitioner did shoot one round of ammunition. Appellate counsel also claimed that trial counsel was ineffective because he elicited testimony from a defense witness that the witness heard the police tell petitioner to drop the gun.  Appellate counsel argued that trial counsel improperly elicited from another defense witness that petitioner was agitated prior to the shooting.

31

This court finds that none of the actions above were unreasonable, and even if they could be considered errors, there was no prejudice to petitioner.  Although the gun was cocked when it was taken into police custody, trial counsel attempted to elicit testimony that the gun could have been in that condition because when petitioner fell, the gun fell out of his hands and hit the ground with sufficient force to break the handle of the rifle and to cock the rifle so that it would be in that position when the police obtained the rifle after the incident. (T. 944-46).  Trial counsel was attempting to explain why the gun would have been cocked when the police recovered the gun.  The prosecution's theory was that petitioner was ready to shoot again, while defense counsel attempted to elicit testimony that the gun could have been in firing position without petitioner intending to shoot.  Thus, there was no question that the gun was cocked, and trial counsel would not have been acting unreasonably by eliciting that fact from a witness.

Regarding the claim that trial counsel erred in eliciting testimony from a defense witness that he heard the police tell petitioner to drop the gun, petitioner himself testified that the police told him to drop the gun, but started shooting prior to finishing the order. (T. 1705).  Thus, the critical issue was not what the police said, but **when** they said it in relation to petitioner's actions.  Petitioner also admitted shooting the gun prior to the police arriving.  A spent casing from the rifle was found in the area.  There would have been very little prejudice to petitioner from a witness

testifying that a round from petitioner's rifle had been fired.  In fact, on cross-examination of Senior Investigator Thomas Martin, defense counsel elicited an admission that the casing from the rifle could have been related to the earlier firing of the gun. (T. 649).

Finally, appellate counsel claimed that trial counsel did not properly argue that a defense expert should be allowed to testify.  Trial counsel wished to introduce the testimony of a Dr. Lienan.  At trial, there was a lengthy discussion of whether Dr. Lienan was qualified as an expert and a discussion of the areas of expertise to which he would testify if called as a witness. (T. 1846-1888).  Trial counsel argued strenuously that Dr. Lienan, a professor of sociology and a former detective should be able to testify about the reconstruction of the crime scene and the trajectory of bullets in order to support the petitioner's version of the events in the case.

The prosecutor objected to Dr. Lienan testifying as to all the areas proposed, and the court found that Dr. Lienan was not qualified as an expert in any of the areas that counsel proposed. (T. 1886-87).  Dr. Lienan's credentials would not have changed regardless of defense counsel's arguments.  Additionally, the court found that the fact that Dr. Lienan had been out of the detective field for twelve years at the time of the trial was also important to the ruling.[10] (T. 1886).  The fact that the witness had not

---

[10] The court did rule that Dr. Lienan could testify regarding any bullet holes that he observed himself at the scene. (T. 1875, 1887).  Defense counsel argued that there were additional bullet holes that were missed by the investigators in the case. (T. 1855).

been in the field for a long time would also not have changed regardless of trial

counsel's argument.  Thus, to claim that it was trial counsel's insufficient argument

that prevented court from allowing the expert to testify is meritless.  Thus, taking all

trial counsel's alleged errors together, this court finds that petitioner's attorney did not

render ineffective assistance of counsel, either because he did not act unreasonably or

because no prejudice resulted from his actions.

**5.** **Grand Jury Claim**

In his federal habeas corpus application, petitioner alleges that the Grand Jury

that indicted him did not represent a "clear, honest cross-section of the community."

(Dkt. No. 2 at p.4).  Petitioner also claims that there were no blacks, minorities or

young males on the Grand Jury or anyone that could have been considered petitioner's

"peer". *Id.*

On appeal to the Appellate Division, petitioner also made a Grand Jury claim,

but his claim on appeal *had nothing to do with the composition of the Grand Jury*.

On appeal, petitioner argued that the indictment itself was defective because it did not

give the petitioner fair notice of the accusations against him. State Court Record at

p.36 (Petitioner's Appellate Brief at 34).  Petitioner's appellate counsel argued that

defense counsel could have cured this defect by requesting a bill of particulars, but

was ineffective for not doing so.  Thus, petitioner claimed that the defective

indictment and his counsel's ineffectiveness necessitated reversal of the conviction.

34

Petitioner also did not raise the Grand Jury composition issue in his application for leave to appeal to the New York Court of Appeals. State Court Record at 367-68 (letter to New York Court of Appeals).

In petitioner's section 440.10 motion, he did raise the same Grand Jury claim that he raises in this application. State Court Record at 406.  County Court Judge Lehman did not mention this issue in his decision, and instead stated that all the issues that petitioner presented in the section 440.10 motion had "previously been addressed by the Appellate Division." State Court Record at 411.  Although the Appellate Division did state that the court "considered and rejected defendant's challenge to the indictment", the petitioner had raised only the notice issue on appeal.  In fact, the case cited by the Appellate Division in support of its decision deals with the notice issue and *not* with an issue of Grand Jury composition. *See* 268 A.D.2d at 795, 702 N.Y.S.2d at 219 (citing *People v. Iannone*, 45 N.Y.2d 589, 412 N.Y.S.2d 110, 384 N.E.2d 656 (1978)).  Therefore, the Appellate Division never considered the issue that petitioner raises in this application.

The court would point out that if petitioner had raised the notice issue in this application, it would not have been cognizable.  Deficiencies in State grand jury indictments are not cognizable on federal habeas corpus review. *United States v. Mechanik*, 475 U.S. 66, 70 (1986); *Lopez v. Riley*, 865 F.2d 30, 32 (2d Cir. 1989). Although County Court Judge Lehman did not specifically mention the Grand Jury

composition issue that petitioner attempted to raise in his section 440.10 motion, as stated above, Judge Lehman first held that he was statutorily prohibited from deciding the claims that petitioner had already presented to the Appellate Division.

In making this decision Judge Lehman cited N.Y. CRIM. PROC. LAW § 440.10 (2)(a) and (2)(c).  Section (2)(a) provides that the County Court must deny claims that were raised and decided on direct appeal, but section (2)(c) provides that the court must also deny claims that were unjustifiably not raised, but *could have been* raised on direct appeal.  Although petitioner did raise a grand jury claim on direct appeal, he did not raise the same issue that he raised in his section 440.10 motion.  A clear ruling based upon section 440.10(2)(c) is considered a procedural default. *See Arce v. Smith*, 889 F.2d 1271, 1273 (2d Cir. 1989).

If the state court rejected petitioner's claim on procedural grounds, petitioner would not be able to bring his claim in federal court because a state prisoner who has procedurally defaulted on a federal claim in state court is entitled to federal habeas review of that claim *only* if he can show both cause for the default and actual prejudice resulting from the alleged violation of federal law, *Coleman v. Thompson*, 501 U.S. 722, 750 (1991), or establish that failure of the court to consider the claim will result in a miscarriage of justice. *Id.* at 748.

A miscarriage of justice will have occurred if the constitutional violation has "probably resulted in the conviction of one who is actually innocent." *Murray v.*

*Carrier*, 477 U.S. 478, 496 (1986). The "innocence" to which the case law refers must be "actual," not merely "legal" innocence. *Schlup v. Delo*, 513 U.S. 298, 324 (1995). In order to prove actual innocence, the petitioner must have new, reliable evidence of either exculpatory scientific evidence; trustworthy eyewitness accounts; or critical physical evidence that was ***not presented at trial***. *Id.*

Since petitioner raised the defective indictment grand jury claim on direct appeal, he can show no cause why he did not raise the grand jury composition issue on direct appeal.  He does not claim that his appellate counsel was ineffective, nor could he make that claim in his habeas corpus application without having exhausted it as a separate claim in State court. *See Murray v. Carrier*, 477 U.S. 478, 496 (1986). Because petitioner has not shown cause, the court need not proceed to an analysis of prejudice, and petitioner's Grand Jury claim may be dismissed.

If it should be found that the County Court's ruling was ***not*** based on a procedural default and this court were to consider the merits of petitioner's jury composition claim, this court would still recommend dismissal of this claim. Petitioner merely claims that the Grand Jury did not represent a fair cross-section of the community, that there were no blacks, minorities, or young males on the panel. Petitioner also makes a cryptic statement that his attorney wished to get a ruling about the "prosecutorial nature of the District Attorney during the hearing ... ."  In his amended application, petitioner alleges that he was not allowed to speak to a judge

during the proceeding.

The basic principles prohibiting exclusion of individuals from participation in jury service are the same for grand juries as they are for petit juries. *Reyes v. Greiner*, 340 F. Supp. 2d 245, 263 (E.D.N.Y. 2004)(quoting *Tankleff v. Senkowski*, 135 F.3d 235, 248 (2d Cir. 2004)).  The Sixth Amendment provides that jury panels be drawn from a source representing a fair cross-section of the community in which the defendant is tried. *Concepcion v. United States*, 181 F. Supp. 2d 206, 226 (E.D.N.Y 2002)(citing *inter alia Taylor v. Louisiana*, 419 U.S. 522, 536 (1975)).  This fair cross-section requirement applies only to the large jury pool, rather than the petitioner's individual panel. *Id.*  In *Taylor v. Louisiana*, the Supreme Court stated that a defendant is not entitled to a jury of any particular composition. 419 U.S. at 538. The Second Circuit has also stated that the Sixth Amendment only guarantees that the defendant will have the possibility of a jury that reflects a fair cross-section of the community, not that he will have a jury of any particular composition. *Roman v. Abrams*, 822 F.2d 214, 229 (2d Cir. 1987).

The Fourteenth Amendment equal protection clause also protects a defendant from under-representation of minorities, but only if it is the product of ***intentional discrimination.*** *Concepcion*, 181 F. Supp. 2d at 227 (citing *Alston v. Manson*, 791 F.2d 255, 257 (2d Cir. 1986)).  A defendant is protected under the Fourteenth Amendment from a "systemic exclusion of a distinctive group in the community." *Id.*

(citing *Duren v. Missouri*, 439 U.S. 357, 364 (1979)).

In this case, as in *Concepcion*, the petitioner has made absolutely **no** showing under either of the standards above.  Petitioner barely raised the claim in his state court motion to vacate his conviction and alleged only that there were no blacks, minorities, or young males on the jury.  Standing alone, this claim does not raise an under-representation claim under the Sixth Amendment because without some evidence that the pool from which the grand jurors were chosen did not represent a fair cross-section of the community, petitioner cannot state a constitutional claim referencing only his particular grand jury.  Additionally, petitioner has not alleged that the under-representation was in any way intentional sufficient to state a claim under the Fourteenth Amendment.

Finally, it is unclear what type of claim petitioner might be trying to raise when he states that he was not allowed to speak to a judge during his grand jury testimony.  Petitioner does not elaborate on this claim in his habeas corpus petition, and in his section 440.10, motion he only stated that ***his attorney*** was not allowed to speak to a judge regarding the "prosecutorial manner" of the District Attorney during the proceeding. State Court Record at 406.  Petitioner cites no support for these conclusory statements.  Thus, petitioner's Grand Jury claim may be dismissed as either procedurally defaulted or dismissed on the merits.

39

**6.**     **Weight of the Evidence**

In his federal habeas corpus application, petitioner claims that the verdict was against the weight of the evidence.  A claim that the verdict is against the "weight of the evidence" is a purely state law claim, based upon N.Y. CRIM. PROC. LAW § 470.15, whereas a legal sufficiency claim is based upon federal constitutional principles. *See Garbez v. Greiner*, 01 Civ. 9865, 2002 U.S. Dist. LEXIS 13806, *24-25 (S.D.N.Y. July 30, 2002)(citing *People v. Bleakley*, 69 N.Y.2d 490, 515 N.Y.S.2d 761, 508 N.E.2d 672 (1987)).  Insofar as petitioner raises a claim that the verdict was against the weight of the evidence, it must be dismissed as not cognizable in a federal habeas corpus application.

The court would point out, however, that in the Appellate Division, petitioner raised both a claim that the verdict was against the weight of the evidence and a claim that the evidence was legally insufficient to sustain the conviction.  The Appellate Division decided both claims on their merits. 268 A.D.2d at 793-94, 702 N.Y.S.2d at 218-19.  Since petitioner in this action is pro se, and the Appellate Division did consider his sufficiency of evidence claim on its merits, this court will also consider the claim.  Because the claim was rejected on the merits, the AEDPA standard of review applies.

The petitioner has a heavy burden in a ***legal sufficiency*** of evidence claim. *Vera v. Hanslmaier*, 928 F. Supp. 278, 284 (S.D.N.Y. 1996).  The well-established Supreme

Court precedent provides that a court must determine whether any rational trier of fact would have found the essential elements of the crime beyond a reasonable doubt. *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1970)).  The evidence must be viewed in the ***light most favorable to the prosecution***. *Id.*

Issues of credibility are for the jury to resolve. *Vera v. Hanslmaier*, 928 F. Supp. at 284 (citation omitted).  Under federal standards, a conviction may also be based on circumstantial evidence "so long as, from inferences reasonably drawn, the jury could fairly have found beyond a reasonable doubt that the defendant engaged in the charged criminal conduct." *United States v. Sureff*, 15 F.3d 225, 229 (2d Cir. 1994).

In this case, the court finds that the Appellate Division did not act contrary to or unreasonably apply Supreme Court precedent in rejecting petitioner's claim.  Both police officers testified that petitioner was told to drop the gun, and that rather than complying with the order, he pointed his gun at the officers.  Officer LaPlante conceded that he fired first because he believed the petitioner was going to shoot at the officers.  The officers also testified that after Officer LaPlante fired the first shot, petitioner fired a shot in return.  The officers then fired back at petitioner.  After petitioner fell, he continued to shout obscenities and again reached for his gun, causing Officer Colwell to fire another shot.

The ultimate issue, as recognized by the Appellate Division was the conduct

that triggered the actions of the officers. 268 A.D.2d at 793, 702 N.Y.S.2d at 218.

Although petitioner claimed that he never fired his gun at the officers, there was a

spent casing recovered, and the rifle was cocked when recovered by the police.  Both

officers testified that they saw the muzzle flash.  Additionally, Lori Region testified

that she heard the police tell petitioner to drop the gun before she heard the first shot.

She also testified that the reason that she called the police was that she heard

petitioner's rifle go off twice, so she was familiar with the sound of petitioner's rifle.

She testified that after she heard the police tell petitioner to drop the gun, she heard a

softer gun sound, and then a loud shot similar to the petitioner's rifle.  This testimony

supports the testimony of the officers that petitioner did shoot his gun during the

incident.  Ms. Region's testimony was entirely consistent with that of the officers.

Although petitioner's assertion that he did not fire his gun was consistent with a

description of the incident in the State Police teletype that did not mention his

shooting, and was consistent with the officer's admission that they did not include this

fact in their notes, clearly the jury chose to believe the officer's version of the events,

supported by Ms. Region's testimony as well as the testimony of the police experts

who testified regarding the shooting of petitioner's rifle.

Petitioner's girlfriend testified that petitioner was agitated and depressed that

evening and that he talked about killing himself.  Sergeant White testified that he

overheard petitioner tell his girlfriend that he had rounds in the rifle for himself as

42

well as the police.  It was not unreasonable for the jurors to believe that when the

police told petitioner to put the gun down, he did not do so and instead pointed the

rifle at the officers.  It was also not unreasonable to find that once Officer LaPlante

fired the first shot, petitioner fired back at the officers.  The Appellate Division did not

violate the AEDPA standard in denying petitioner's sufficiency of evidence claim.

Thus, petitioner's insufficient evidence claim may be dismissed.

7.    **Expert Witness Claim**

Petitioner's final claim is that the court erred in failing to allow his proffered

expert witness, Dr. Lienan.  As the respondent argues, petitioner never raised this as a

separate claim in state court.  Petitioner only raised this issue in conjunction with his

claim that counsel was ineffective because he failed to properly argue that Dr. Lienan

should testify as an expert.  Because petitioner did not raise this as a separate claim, he

failed to exhaust his state court remedies with respect to this issue as required in 28

U.S.C. § 2254(b)(1).

However, the habeas corpus statute also provides that a court may dismiss a

claim that has not been exhausted. 28 U.S.C. 2254(b)(2).  Although the Second Circuit

has not articulated a standard for the denial of a claim notwithstanding the failure to

exhaust,[11] it has been stated that a majority of district courts have found that in order

_____

[11] The court does note that the Second Circuit did decide a case in which it used the
"patently frivolous" standard, however, that decision was later withdrawn and decided on other
grounds. *See Jones v. Senkowski*, No. 00-2145, 2002 U.S. App. LEXIS 2669 (2d Cir. Feb. 18,

to deny the claim under section 2254(b)(2) the claim must be "patently frivolous." *See Rosario v. Bennett*, 01 Civ. 7142, 2002 U.S. Dist. LEXIS 24495 * 58-59 (S.D.N.Y. Dec. 20, 2002).  After a review of the state court record, this court finds that it should recommend denial on the merits of the expert witness claim.

As stated above, petitioner argued in state court that his counsel was ineffective because he failed to properly argue that Dr. Lienan should testify as an expert.  If petitioner alleges that his attorney did not properly argue the issue, petitioner cannot claim that the court erred in failing to allow the testimony.  In any event, as respondent points out rulings by a state court on evidentiary issues are state law issues not cognizable in a federal habeas proceeding. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  The court would also point out that the state court's ruling on the issue appears to be correct.  The "expert" had not been in the detective field for twelve years prior to petitioner's trial and had a degree in sociology.  The trial court found that the witness was not qualified as an expert in the subjects about which defense counsel would have had him testify.  Thus, petitioner's final claim may be dismissed.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the petition be **DENIED and DISMISSED.**

---

2002), *vacated, op. withdrawn*, 42 Fed. Appx. 485 (2d Cir. May 22, 2002).  Originally, the court had denied on the merits notwithstanding non-exhaustion, utilizing the patently frivolous standard, however, the subsequent opinion deemed the claim exhausted and dismissed based upon procedural default. *Id.*  Thus, there was no need to articulate a standard because the court ultimately did not use section 2254(b)(2).

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: January 23, 2006

_____

Hon. Gustave J. DiBianco
U.S. Magistrate Judge

45